Filed 9/28/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PAIGE TILLIE LINVILLE,<br><br>    Defendant and Appellant. | A140600<br><br>(Solano County<br>Super. Ct. No. FCR274989) |
| In re PAIGE TILLIE LINVILLE,<br><br>    on Habeas Corpus. | A147938 |

Defendant Paige Linville was charged with two counts of murder in connection with a brazen, drug-fueled killing spree carried out with her ex-boyfriend. Their victims were two unsuspecting strangers, gunned down deliberately for sick thrills within 24 hours of each other. The first victim, transient Amber Chappell, was killed shortly after midnight on a remote backroad in Cordelia, California after the couple picked her up for a ride in Linville's SUV. The second victim, Christina Baxley, was killed later the same day in Dixon, California, in broad daylight, when the couple spotted her taking her dog for a walk.

A jury deadlocked on the murder charge against Linville concerning the first victim, Amber Chappell, but found Linville guilty of first degree murder and conspiracy to commit murder in the shooting death of the second victim, Christina Baxley.

Linville now appeals, contending she should not have been prosecuted for either murder because she had already been prosecuted for a crime related to the killings. Previously, she pled guilty and was sentenced to a three-year prison term for being an

1

accessory after the fact to the killings, for having disposed of the vehicle used in the killings (by trading it for another car). She entered that plea while the homicide investigation was at an early stage, at a time when she denied any involvement in either shooting. Her accessory conviction was based on the premise her boyfriend had committed the murders and Linville later got rid of the vehicle to help him evade detection. Now she asserts that because her prior conviction and the present prosecution involve the same murders, her murder prosecution for the two shooting deaths was prohibited by Penal Code section 654's ban on multiple prosecutions, because the prosecution knew or should have known of the potential murder charges when it charged her the first time.

We disagree. While the accessory charge and the homicide charges involved the same killings, the same course of conduct did not play a significant part in both prosecutions and section 654 therefore does not apply. Accordingly, we affirm the judgment on direct appeal and deny Linville's related petition for a writ of habeas corpus.[1]

## BACKGROUND

Sometime after midnight, in the early morning hours of November 16, 2007,[2] Linville and her boyfriend Mario Moreno drove in Linville's SUV to the parking lot of a shopping center in Vallejo, California to sell drugs, after having smoked methamphetamine together. The two often dealt drugs to support their methamphetamine habit. As they were driving out of the parking lot afterwards, a woman later identified as Amber Chappell emerged from the sidewalk and flagged them down, asking for drugs and a ride. Moreno, who was driving, declined to stop for her and they drove away. But then Moreno asked Linville if she had ever thought about killing someone, and Linville said yes. They turned around, went back and picked up the woman.

---

[1] Previously we ordered that Linville's petition for a writ of habeas corpus would be considered with her direct appeal. We hereby consolidate the two now for purposes of decision.

[2] All dates are in that year unless otherwise specified.

According to Moreno, they did this intending to kill her. Moreno said she seemed like an easy target. And, according to Moreno, he asked Linville if she wanted to kill the woman and Linville said yes.

The woman wasn't very coherent when they picked her up, seemed high on drugs and wanted more. She told them her name was Amber. They drove around with her for an hour or two promising to find her some drugs, but then stopped at the end of a secluded, dead-end road in Cordelia. According to Moreno, Linville pulled Amber out of the car. Moreno then got out, walked over and shot her in the head, multiple times. He and Linville then drove off.

According to Linville, there was no plan to kill Amber Chappell. Moreno started shooting out of the blue, and Linville was terrified and in shock after it happened as they drove back to Vallejo. When Moreno had asked if she ever thought about killing someone, she thought it was one of the ridiculous things he would often say and responded "[s]ure, whatever Mario." Linville had helped him get Chappell out of the SUV because she had been touching and grabbing Moreno flirtatiously and he was irritated.

After the killing, they briefly stopped by the home of one of Moreno's friends in a nearby trailer park and Moreno told his friend about the killing. They then went to buy cleaning supplies at a 24-hour Walmart and cleaned the inside of Linville's SUV, and at six or seven in the morning drove to a carwash in Vallejo and cleaned out the car again. Next, they bought more ammunition and paper targets and went to a rural property in Dixon that Moreno's uncle owned and shot target practice. After that, they drove around Dixon together, eventually parked and smoked more methamphetamine. When they resumed driving, they saw a woman, later identified as Christina Baxley, walking a dog, and Moreno stopped the car.

Moreno testified Linville got out of the car and shot Baxley. She did this, according to Moreno, after having told him during their target practice that she should shoot someone too so Moreno wouldn't have to worry about her telling on him.

3

According to Moreno, Linville donned a wig, they drove around Dixon looking for someone to kill and ultimately she picked Baxley as their next victim.

Linville testified it was Moreno who got out of the car and shot Baxley. According to Linville, Moreno's friend had said upon learning of the first killing that only one person walks away from something like that, and so Moreno had been insisting Linville would have to kill someone too or else he would kill her, and he had been driving around looking for someone for her to shoot while she protested in fear. Linville testified she was terrified by the second killing, and had no idea Moreno was planning to do that. Afterwards, Moreno drove them back to Vallejo and dropped Linville off at work.

Approximately two to five days later, Linville drove her SUV to Richmond and got rid of it by trading cars with a friend.

A month later, acting on a hotline tip implicating both Moreno and Linville, police arrested Moreno for both murders, on December 18. Moreno confessed to being present at both crimes but told police Linville had committed the killings. The next day, Linville was arrested for both murders too. She denied knowing anything about the killings and asked for a lawyer.

Moreno was charged in a felony complaint with two counts of murder on December 20. The next day, the People filed a "notice of pending prosecution" stating that no formal murder charges would be brought at that time against Linville, pending further investigation. Five days later, on December 26, the People filed a second notice stating the same thing, along with a felony complaint charging Linville with being an accessory after the fact to murder by Moreno and possession of methamphetamine.

A week and a half later, on January 4, 2008, Linville pled guilty to both counts when the matter was called for a preliminary hearing. She believed that by doing so, she could not later be charged with murder. The prosecutor said he didn't object to the plea. He also said he didn't think *Kellett v. Superior Court* (1966) 63 Cal.2d 822 was implicated, a reference to the leading California Supreme Court case construing

4

section 654, but in any event would have four weeks until sentencing "in which to figure it out for sure."

The Solano County Probation Department subsequently interviewed Linville, with her counsel present, and she concocted a story about what had happened. According to the probation report in her prior case, she told the probation officer she loaned her SUV to Moreno, and when he returned it he told her to get rid of it because something bad had happened in it. She felt intimidated by Moreno and agreed to swap the vehicle with a friend in another county without knowing what had occurred. She found out about the homicides a few days after they occurred but didn't go to police because she felt intimidated and thought it was best just to get rid of the vehicle. In a handwritten statement attached to the probation report, she expressed "regret that nothing I could have done could have prevented the crimes from taking place."

At the trial in this case, she admitted she was untruthful in the probation interview and had been present at both killings. She testified her lawyer had advised her in the prior case to limit her "discussion of what happened" with the probation department "to only the circumstances regarding what I pled to, which was that my car was exchanged with another car," because her lawyer "thought it was in my best interest not to discuss any of the details, the facts of the case that I told her, what she told me."

While awaiting sentencing, Linville wrote to an acquaintance that she had "pled guilty quick, fast, [and] in a hurry" to the accessory charge, that at her next court appearance the prosecution would either refile the murder charges against her or she would be sentenced, and that "[i]f I get sentenced they won't be able to refile later." On February 1, 2008, Linville was sentenced to the upper term of three years for the accessory charge, and received a total prison term of three years and eight months. When asked the factual basis for the plea, the prosecutor referred the court principally to the contents of the probation report.[3]

_____

[3] The prosecutor also added that a shell casing had been discovered in the windshield wiper of the SUV when they recovered the car in Richmond, that it was being tested and that the prosecution expected it to match the shell casings found at both

5

Shortly after Linville was sentenced, several prison inmates came forward and volunteered to authorities that she had made numerous incriminating, even boastful, statements about participating in the murders and about getting away with it because charges could not be refiled against her.[4]

After sentencing, Linville also immediately began writing letters gloating about the sentence she had received. The day she was sentenced, she wrote in one: "God is good. I never thought I would be happy to get a prison term, but, hey, it's looking real cool right now." In another letter the same day: "[S]o I just got back from court and they sentenced me to three years, eight months. Praise God. He does work miracles. . . . I never thought I'd be lucky to get a prison term, but it is what it is." Two days later,

---

homicide scenes. The prosecutor also reported that the same weapon was used in both shootings, but the firearm was never recovered.

[4] Not all of them testified in Linville's later murder trial. According to law enforcement records attached to the prosecution's opposition to Linville's motion to dismiss the later complaint charging her with murder, however, one inmate, Jamie Anderson, told authorities Linville had said her co-defendant had "told on" both of them and that if she had been arrested within 24 hours of the homicide the authorities would have found gun residue all over her. Another inmate, Belle Peterson, overheard Linville say on a transport bus to court that Moreno had "snitched" on her. Peterson also said Linville was very angry with Moreno, and was telling everyone that Moreno had told the police on her. Inmate Isabela Verela reported that Linville had said she wanted to see what it felt like to kill someone, picked her victims randomly, had no feelings about the killings, and laughingly told Verela "How do you want me to feel, I don't know them, I don't care about them." Verela reported that Linville would brag about committing the murders and that she "got away" with it, and said she had been in Dixon driving around with Moreno because they were on a mission to kill people. And Paula Moyer, who was Linville's cellmate while in county jail awaiting trial, reported extensive incriminating statements by Linville, including that Linville admitted killing one of the victims and said Moreno had killed the other one, the police would never find the gun, and that murder charges could not be refiled against her. According to Moyer, after Linville was sentenced on the accessory charge, Linville freely admitted killing one of the women and would laugh about it. She bragged that she was sentenced to just three years and eight months and had got away with murder. Moyer also reported that Linville became infatuated with serial killer Richard Ramirez, and wrote him a letter boasting about the murders.

another letter to someone else: "God is wonderful. I got sentenced to three years, eight months with half. The DA was <u>so</u> pissed and the detectives are hot too. But, hey, it's not what they hear. It's what they can <u>prove</u>, right?" And on February 5, she reported in another: "So I went to court and they didn't refile. I got the three years, eight months. God is good. [¶] The DA and detectives were pissed, but they couldn't find the evidence they needed to charge me again. And it's not what they know. It's what they can prove."

Less than three weeks after sentencing, Linville also wrote a fawning letter to convicted serial killer Richard Ramirez displaying a morbid fascination with cold-blooded murder and also discussing her case. She knew her mail was being searched. Among other things, she told Ramirez the prosecution lacked evidence to prosecute her for murder, "[s]o they threw an accessory after the fact charge at me, and I walked out of the courtroom full of irate detectives and a furious DA with a sentence of three years, eight months." She asked Ramirez whether he liked "that look of terror in the eyes of prey," and told him she had always "been enthralled by True Crimes, but maybe my breed of attraction stems from different roots than the casual fan." And she told him, "I never should have been arrested based on the absence of underlying evidence linking me to my crimes, but was railroaded into accepting a guilty plea to a lesser charge to sidestep the obviously corrupt attempts of law enforcement to gather evidence that can lead to more serious charges."

Linville served less than two years in custody and in November 2009 was released on parole.

Shortly thereafter, in late March 2010, Moreno was scheduled to go to trial on the murder charges against him but agreed to testify against Linville as part of a plea bargain, memorialized and placed on the record on April 1, 2010. On March 30, 2010, Linville was rearrested and charged with both murders, and with conspiracy to commit the second murder.

The defense contended before trial that the present prosecution was barred by Penal Code section 654 (section 654) and *Kellett*. It did so in a motion to dismiss the complaint filed shortly after Linville was rearrested and charged, again in a motion to set

7

aside the information after the preliminary hearing, and then later in a renewed motion to dismiss the information based on additional information obtained in discovery. The prosecution argued the statute didn't apply because the crimes didn't involve the same course of conduct, and furthermore it had insufficient evidence to charge her with murder at the time of the initial prosecution, because it wasn't until after she had been convicted and sentenced that she made a number of incriminating admissions. All of Linville's motions were denied.

The case proceeded to a jury trial. The jury deadlocked on the murder count as to the first victim, Amber Chappell, and a mistrial was declared on that count. The jury found Linville did not personally discharge a firearm in Christina Baxley's killing, acquitting her of the firearm enhancement for that homicide (Pen. Code, § 12022.53, subd. (d)), but found her guilty of both first degree murder and conspiracy to commit murder in the Baxley killing. The court sentenced Linville to twenty-five years to life in prison, and this appeal and related habeas corpus petition followed.

## DISCUSSION

## I.

### *Introduction*

Subdivision (a) of Penal Code section 654 proscribes both multiple punishment and multiple prosecutions. It states: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (Pen. Code, § 654, subd. (a).) The preclusion of multiple punishment is "separate and distinct" from the preclusion of multiple prosecutions (*Neal v. State* (1960) 55 Cal.2d 11, 21, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331, 338), and only the latter is at issue here. "The rule against multiple prosecutions is a procedural safeguard against harassment and is not necessarily related to the punishment to be

8

imposed; double prosecution may be precluded even when double punishment is permissible." (*Neal*, at p. 21.)

*Kellett v. Superior Court* (1966) 63 Cal.2d 822 (*Kellett*) is the leading case interpreting section 654's bar against successive prosecutions. *Kellett* explained the provision reflects the policy that "both criminal defendants and the public fisc are entitled to protection from successive prosecutions for closely related crimes." (*Id*. at p. 826.) And because of that purpose, the proscription against multiple prosecutions is broader in scope than section 654's proscription against multiple punishment. According to *Kellett*, "[i]f needless harassment and the waste of public funds are to be avoided, some acts that are divisible for the purpose of punishment must be regarded as too interrelated to permit their being prosecuted successively." (*Id*. at p. 827.) *Kellett* explained, "[w]hen there is a course of conduct involving several physical acts, the actor's intent or objective and the number of victims involved, which are crucial in determining the permissible punishment, may be immaterial when successive prosecutions are attempted." (*Ibid.*) Rather, under *Kellett*, "[w]hen . . . the prosecution is or should be aware of more than one offense *in which the same act or course of conduct plays a significant part*, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Ibid.*, italics added.)

The bar against successive prosecutions is subject to a judicially recognized exception for unavailable evidence. Derived from constitutional double jeopardy principles, the exception applies when the prosecutor " 'is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence.' " (*People v. Davis* (2005) 36 Cal.4th 510, 558.)

Linville argues that section 654 applies here, because the same course of conduct played a significant part in both her conviction as an accessory to the Chappell and Baxley murders and in the later murder charges against her, and the prosecution also was

9

aware, and/or should have been aware, of potential murder charges when it charged her as an accessory. She contends the unavailable evidence exception does not apply, in light of the evidence the prosecution had at its disposal at the time it secured her conviction as an accessory that implicated her in the actual murders. The latter point is developed at greater length in Linville's habeas petition, based on facts outside the record of her direct appeal.

The People contend Linville's conviction as an accessory was not based on the same course of conduct as the murder charges given the facts and circumstances of the offenses, and that barring her murder prosecution would not be consistent with public policy considered in light of section 654's legislative goals. They also contend the evidence the prosecution had at the time of Linville's initial conviction as an accessory about her involvement in the murders was circumstantial at best and not sufficient to secure a conviction, and that it wasn't until after her various later admissions that the prosecution reasonably believed, in the exercise of its prosecutorial discretion, it had sufficient evidence against her to gain a conviction—and even then, it failed to secure a conviction on the first murder charge.

The unavailable evidence exception is the subject of extensive briefing by the parties, both as to the legal standard and the state of the evidence investigating authorities possessed and/or could have obtained at the time of the first prosecution. It is unnecessary to decide whether the exception applies, however, because we conclude the same course of conduct did not play a significant part in both offenses. *Kellett* therefore did not bar Linville's prosecution for murder, notwithstanding her prior conviction as an accessory.[5]

---

[5] Our conclusion renders moot Linville's habeas petition, which pertains solely to the unavailable evidence exception.

10

## II.

### *Analysis*

The California Supreme Court has provided some guidance as to when "the same act or course of conduct" is involved in multiple offenses for purposes of section 654's preclusion of successive prosecutions. *Kellett* involved a defendant arrested for the single act of standing on the sidewalk with a pistol in his hand. He was charged with and pled guilty to a misdemeanor charge of exhibiting a firearm in a threatening manner, and later separately prosecuted for felony possession of a concealable weapon. The Supreme Court held that the felony prosecution was barred by section 654, notwithstanding the possibility the defendant had possessed the firearm for some time before he was observed brandishing it. (See *Kellett*, *supra*, 63 Cal.2d at pp. 824–825.) The offenses were too "interrelated," in other words, to permit separate prosecutions. (See *id*. at p. 827.) *Kellett* also gave as an example that "[a] conviction and sentence for petty theft would therefore bar a subsequent prosecution for burglary of premises entered with intent to commit that theft, since only a single act within the meaning of section 654 would be involved." (*Id*. at p. 828.)

In the decades since *Kellett*, the California Supreme Court has addressed the multiple prosecution issue on a few occasions. In *People v. Goolsby* (2015) 62 Cal.4th 360, 366, the court expressed "no doubt" that *Kellett* would prohibit a new prosecution on the lesser charge of arson of property if the defendant had been tried and, by way of appeal, acquitted of the charge of arson of an inhabited structure and the jury had never been presented with the lesser charge. (The court held section 654 did not preclude retrial of a defendant on that lesser charge after his conviction on the greater charge was reversed on appeal, because the jury had been instructed on the lesser charge at the prior trial.) In *People v. Carpenter* (1999) 21 Cal.4th 1016, by contrast, the defendant argued that two murders in Santa Cruz and one in Marin County should have been tried together, and that trying him separately for the crimes in each county violated section 654. (*Id*. at p. 1038.) The court disagreed, distinguishing *Kellett*. Whatever the scope of that decision, "the murder of separate victims on separate days in separate counties is not a

11

single act or even 'course of conduct' [citation] requiring a single prosecution." (*Ibid.*) This was so even though the prosecution of defendant for the Marin murders presented much of the same evidence about defendant's earlier crimes and convictions presented at the earlier trial for the Santa Cruz murders. (See *id.* at pp. 1030–1031; accord, *People v. Marlow* (2004) 34 Cal.4th 131, 144.)

The Supreme Court most recently applied the "same course of conduct" standard in *People v. Britt* (2004) 32 Cal.4th 944 (*Britt*), where it held section 654 barred successive prosecutions for two violations of mandatory sex offender reporting requirements that arose from a single change of residence. In *Britt*, the defendant moved between two counties and in so doing committed two crimes, by failing to notify law enforcement officials in the county of his *former* residence of his move (former Pen. Code, § 290, subd. (f)(1)) and also failing to report it to law enforcement officials in the county of his *new* residence (*id.*, subd. (a).) (*Britt*, at pp. 949–950, 952.) *Britt* held the second prosecution, undertaken in the county of his new residence, was barred by his prior conviction in the county of his former residence. Although the two offenses were distinct, the court reasoned that "a single unreported move within California . . . played a significant part in both omissions." (*Id.* at p. 954.) *Britt* cautioned its opinion was limited to "a single move directly from one jurisdiction to another," and did not address "how section 654 would apply to other facts, such as multiple moves or the maintenance of multiple residences." (*Britt*, at p. 951, fn. 4.) The court also stated that the bar against multiple prosecutions "must be determined on a case-by-case basis." (*Id.* at p. 955.)

In the wake of *Kellett*, the appellate courts have developed two different tests to determine if the same course of conduct plays a significant part in multiple offenses for purposes of section 654's ban on multiple prosecutions. (*People v. Ochoa* (2016) 248 Cal.App.4th 15, 28.) "Under one line of cases, multiple prosecutions are not barred if the offenses were committed at separate times and locations. . . . [¶] A second version of the test—the 'evidentiary test'—looks to the evidence necessary to prove the offenses. [Citation.] '[I]f the evidence needed to prove one offense necessarily supplies proof of the other, [. . .] the two offenses must be prosecuted together, in the interests of

12

preventing needless harassment and waste of public funds.' [Citation] 'The evidentiary test . . . requires more than a trivial overlap of the evidence. Simply using facts from the first prosecution in the subsequent prosecution does not trigger application of *Kellett*.' " (*Id*. at pp. 28–29.)

Linville argues the "different time/different place" formulation is not an established standard under *Kellett* and/or has been disapproved by *Britt.* She contends that what matters instead is whether multiple offenses are "related, such that the same course of conduct played a significant part in both offenses," a question answered by examining the degree of evidentiary overlap between them under the evidentiary test.

It unnecessary to decide whether the different time/different location test retains continuing vitality under section 654, at least as a stand-alone test. (Compare, e.g., *People v. Valli* (2010) 187 Cal.App.4th 786, 798 (*Valli*) [*Britt* reflects that "*Kellett* is not necessarily a simple 'different time/different place' limitation"] with *People v. Marlow*, *supra*, 34 Cal.4th at pp. 143–144 [*Kellett* held inapplicable to murders argued to be related by common motive but carried out at different times in different locations].) Here, Linville's offenses were committed at different times in different places. The murders were committed on November 16, 2007, in Vallejo and Dixon, which are in Solano County, whereas Linville disposed of the vehicle days later in Richmond, which is in Contra Costa County.[6] But there is more. Examining "the totality of the facts" in

_____

[6] Linville disputes that different locations were involved. She argues in her reply brief that venue for the accessory charge would have been proper in Solano County only if the offense took place there. (See § 791.) We disagree. It is true that section 791 requires accessories to be charged in the venue where "the offense of the accessory was committed, notwithstanding the principal offense was committed in another jurisdictional territory." However, Linville's accessory offense was committed in more than one jurisdiction because Linville drove her SUV from Solano County to Contra Costa County to hide it and help Moreno evade detection. Under section 781, venue was proper in either county. (See § 781; cf. *People v. Simon* (2001) 25 Cal.4th 1082, 1109 [venue for assault charges proper in county where car chase began]; *People v. Buono* (1961) 191 Cal.App.2d 203, 223–224 [where car trip was overt act in furtherance of robbery conspiracy, venue proper in county where car trip began]; see also *People v. Mitten* (1974) 37 Cal.App.3d 879 [defendant properly charged as accessory to murders in county

13

light of section 654's legislative goals (*People v. Flint* (1975) 51 Cal.App.3d 333, 336), and focusing on the conduct Linville herself committed, the offenses were not so "interrelated" (*Kellett*, *supra*, 63 Cal.2d at p. 827) as to prohibit the state from pursuing a separate prosecution against Linville, after she pled guilty to being an accessory, for the much more serious murder charges.

The main overlap between the two prosecutions was, of course, the two killings. And we acknowledge that if there had been no murders, Linville could not have been prosecuted as an accessory. But what is relevant for *Kellett* purposes are "the facts of *defendant's* conduct underlying the charged offenses." (*People v. Ochoa*, *supra*, 248 Cal.App.4th at p. 32, italics added.) Implicit in section 654's proscription against multiple prosecutions is criminally charging the defendant more than once for something *the defendant* allegedly did. Linville's initial prosecution as an accessory, however, was based on the theory that someone else, namely *Moreno*, committed the murders.[7] Her conviction as an accessory to those two murders did not require proof, nor was it alleged, that *she* was involved in either killing. Since the accessory conviction did not require and, indeed, was not predicated on an allegation that she committed the murders, it did not involve the same course of conduct as her later murder prosecution.

The fact that both prosecutions involved the same killings does not by itself warrant a conclusion that the same course of conduct played a significant part in both. The closest analogy the parties have cited is *People v. Valli*, *supra*, 187 Cal.App.4th 786, which held that section 654 did not bar a defendant who had been acquitted of murder from later being prosecuted for evading police, even though the evidence of his evading police several days after the murder had been introduced in his murder trial to show his

where killings took place, despite having helped bury murder victims in different county, because multiple accessories were involved].)

[7] Penal Code section 32 defines an accessory as one who "after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof . . . ."

14

consciousness of guilt. (*Valli*, at pp. 790–791.) In concluding that the same act or course of conduct did not play a significant part in both prosecutions, *Valli* reasoned that, "[d]ifferent evidentiary pictures are required—one of a shooting at night and the other of police pursuits in the following days. Different witnesses would testify to the events." (*Id.* at p. 799.) "[A]lthough the People relied in part on proof of the evading to prove the murder," it said, "the necessary interrelation of murder and evading is missing." (*Id.* at p. 801.) As we have explained, the same is true here.

Linville argues *Valli* is distinguishable, principally because in that case the lesser charge (evading) "could be proven without any reference at all to the murder," whereas in this case, "conviction of accessory required proof of the underlying murder." In addition, she argues, here "murder would be proven in part based on [her] ownership of the car used to commit the killings, and based on her trading of this car (in which was found a casing matching casings at the two crime scenes) for another because it was 'hot.' " But this distinction ignores what *Valli* said, which is equally true in this case: "the evidence needed to prove murder—that *defendant* was the shooter—did not supply proof of [the lesser charge]." (*Valli*, *supra*, 187 Cal.App.4th at p. 800, italics added.) *Valli* also reasoned that evidence of the lesser charge, like here, "showed at most a consciousness of guilt as to the murder" but was itself "insufficient to supply proof of the murder." (*Ibid.*) In addition, proof of Linville's ownership of the car used in both killings did not supply proof that she had committed murders; indeed, Linville's presence at the scene of both killings was not in dispute in the murder trial—she merely denied responsibility for the victims' deaths. Further, any overlap in the evidence as between the two prosecutions concerning her ownership of the SUV would have been "trivial" (*Valli*, at p. 799), given extensive additional evidence introduced during the murder trial.[8]

The authorities Linville cites do not compel a conclusion that the same course of conduct was involved in both prosecutions either. For example, the only authority she

---

[8] We presume the parties' familiarity with the extensive trial record, which is summarized in Linville's opening brief and is unchallenged by the People, and which we accept as accurate without the need for repetition.

15

cites addressing whether section 654 bars successive prosecutions as an accessory and as a principal in the underlying offense, is distinguishable.  (See *In re Benny G.* (1972) 24 Cal.App.3d 371 [delinquency petition charging minor as an accessory to armed robbery held barred under section 654 by minor's exoneration on underlying armed robbery charge in prior petition], superseded by statute on other grounds in *In re Michael B.* (1980) 28 Cal.3d 548, 556, fn. 3.)  That case involved a single incident on a single evening (i.e., the minor was present at the scene of a robbery), the prosecutor conceded the two charges "involved basically the same facts and circumstances," and the same witnesses testified to the same facts at both hearings.  (See *Bennie G.*, at pp. 373, 376.)  Moreover, *Benny G.* arose in the juvenile delinquency context, where the policies against successive prosecutions have additional weight because the basic policy of juvenile delinquency favors "expeditious handling of all formal proceedings and the minimization of detention of the minor incident to them."  (*Id*. at pp. 376–377.)  Nor had Linville planned to hide her SUV as part of the murderous spree; she decided to do so only afterwards.  (See *In re Farr* (1976) 64 Cal.App.3d 605, 616 [news reporter who obtained information protected by criminal gag order by promising to maintain source's confidentiality could not be successively held in contempt for obtaining the information and then for refusing to divulge source's identity].)  Unlike the single move at issue in *Britt*, or the single act of gun possession in *Kellett*, Linville's participation in the killings and her subsequent cover-up were distinct in time, and one was carried out with the objective of killing (apparently for its own sake), while the other was carried out with the distinct objective of avoiding detection.  (Compare *People v. Hartman* (1985) 170 Cal.App.3d 572, 583 [dictum that *Kellett* barred murder prosecution of suspect in robbery-homicide who was previously convicted of forgery after using victim's stolen checks and credit cards the day after victim's death]; *Farr*, at p. 616.)  Nor were her actions part of a single, continuing incident that supplied proof of both offenses (see, e.g., *People v. Flint*, *supra*, 51 Cal.App.3d at p. 338 [successive prosecutions on charges for drunk driving, in a stolen car].)

16

Finally, examining the totality of facts in light of section 654's legislative goals (see *Valli*, *supra*, 187 Cal.App.4th at p. 799), we are satisfied the policies of section 654 would not be served by prohibiting Linville's murder prosecution. One factor we may weigh, while not dispositive, is that Linville entered a quick guilty plea to the much less serious accessory charge, without a trial or even a preliminary hearing. In that circumstance, "the public's interest in avoiding the waste of resources through relitigation was minimal," whereas "the public's weighty interest in prosecuting and punishing [her] for the serious crime[]" of murder was great.[9] (See *People v. Davis* (2005) 36 Cal.4th 510, 558–559.)

Another consideration is the relative seriousness of the charges. Given the gravity of the new murder charges against Linville, the risk of waste and harassment from a second prosecution following her guilty plea clearly was "outweighed by the risk that a defendant guilty of a felony may escape proper punishment." (*Kellett*, 63 Cal.2d at p. 828; see also *Britt*, *supra*, 32 Cal.4th at p. 954, fn. 5 [*Kellett* "recognized possible exceptions . . . when the original prosecution was for a less serious crime than the later prosecution"]; *In re Dennis B.* (1976) 18 Cal.3d 687, 696 [discussing state's "undeniable state interest" in prosecuting serious offenses as factor weighing in favor of permitting successive prosecution, where there was "minimal potential for harassment and waste"]; *People v. Eckley* (1973) 33 Cal.App.3d 91, 98; *Stackhouse v. Municipal Court* (1976) 63 Cal.App.3d 243, 247.)

And finally, it is obvious on the rather unique facts of this record, that Linville's murder prosecution did not in any real sense "harass" her, as might have been the case, for example, had she reasonably expected that the initial charges pressed against her would be the last. To put it bluntly, Linville knowingly tried to "get off on a

---

[9] We do not suggest section 654 has a "guilty plea" exception; as Linville points out, *Kellett* itself involved a guilty plea. (See *Kellett*, *supra*, 63 Cal.2d at p. 824; see also, e.g., *Britt*, *supra*, 32 Cal.4th at p. 949 [no contest plea].) Rather, it is a factor our Supreme Court has considered in applying the statute. (See *Davis*, *supra*, 36 Cal.4th at pp. 558–559.)

technicality." She pled guilty to a far less serious charge, lied about her involvement to the probation department before sentencing on that charge, and then immediately turned around and began bragging openly that she had been involved in the killings but could not be recharged and had "got[ten] away with murder."

Whatever the scope of protection against prosecutorial harassment section 654 is intended to provide, we are confident that pressing murder charges against Linville in these circumstances is not the type of harassment the Legislature intended to thwart. "An accused will not be deemed 'harassed' under Penal Code section 654, where the claimed harassment 'may be said to result from his own conduct.' " (*In re Troglin* (1975) 51 Cal.App.3d 434, 439; see also, e.g., *People v. Winchell* (1967) 248 Cal.App.2d 580, 593.) In particular, section 654 "cannot be employed to mislead the court. . . . [I]f a greater violation is concealed in order to gain 'immunity' by prosecution for a lesser crime, section 654 will not apply." (*In re Hayes* (1969) 70 Cal.2d 604, 610, fn. 11 [dictum], overruled on other grounds in *People v. Jones* (2012) 54 Cal.4th 350, 358; accord, *People v. Hartfield* (1970) 11 Cal.App.3d 1073, 1081 [defendant who obtained previous judgment on lesser offense by "connivance and concealment" to avoid prosecution on greater offense "may not claim the benefit of the statute"]; see also *People v. Malveaux* (1996) 50 Cal.App.4th 1425, 1440–1443 [accused who previously lied about age in order to be adjudicated as juvenile rather than adult offender not barred from being retried as an adult]; *Gail v. Municipal Court* (1967) 251 Cal.App.2d 1005, 1008 [defendant who previously gave false explanation about driver's license to law enforcement and pled guilty to lesser charge could be re-prosecuted on more serious charge]; *Hampton v. Municipal Court* (1966) 242 Cal.App.2d 689, 693 [defendant who previously entered false guilty plea on lesser charge to avoid prosecution on more serious charges not protected by section 654]); compare *Crayton v. Superior Court* (1985) 165 Cal.App.3d 443, 452 [defendant who pled guilty to misdemeanor charge but made no affirmative misrepresentations, "in no manner manipulated the proceedings" and was not "on notice or believed that the [prosecution] was ignorant of the fact of dual prosecution" could not be separately prosecuted for felony charge based on same conduct); *People v.*

18

*Bas* (1987) 194 Cal.App.3d 878 [similar].) Linville argues there is no "connivance" here because she made false statements to the probation department only after she pled guilty to the accessory charge. But it is the fact of her sentencing on the prior charge, not her plea, that matters for purposes of a claim of successive prosecution. (See *Hartfield*, at p. 1080.) Section 654's protections are equally unavailable to a defendant who connives and conceals after pleading guilty to a prior charge but before the pronouncement of judgment. (See *Hartfield*, at p. 1081.) That is what Linville did.

## DISPOSITION

The judgment is affirmed. The petition for writ of habeas corpus is denied.

                                                                                _____

                                                                                STEWART, J.

We concur.

_____
KLINE, P.J.

_____
MILLER, J.

*People v. Linville; In re Linville on Habeas Corpus* (A140600, A147938)

Trial Court:   Solano County Superior Court

Trial Judge:   Hon. Allan P. Carter

Counsel:

Laura S. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, René A. Chacón, Supervising Deputy Attorney General, David M. Baskind, Deputy Attorney General, for Plaintiff and Respondent.