Filed 9/26/24  P. v. Cabrera CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>GABRIEL CABRERA,<br><br>　　　　Defendant and Appellant. | C099447<br><br>(Super. Ct. No. 23FE005693) |

Defendant Gabriel Cabrera pled no contest to a corporal injury offense against his girlfriend that occurred on January 10, 2023.  He was later charged in this case with discharging a firearm in a grossly negligent manner and being a felon in possession of a firearm several days prior to the domestic violence incident charged in the first case.  The trial court denied defendant's pretrial request to dismiss the firearm charges in the second case under Penal Code[1] section 654 and *Kellett v. Superior Court* (1966) 63 Cal.2d 822 (*Kellett*), and a jury found defendant guilty of those offenses.

---

[1]　　　Further undesignated statutory references are to the Penal Code.

1

Defendant argues on appeal that the trial court erred in not dismissing the firearm charges under the *Kellett* rule because the domestic violence offense and the firearm offenses occurred at substantially the same time and location, and the evidence was required to prove that the domestic violence offense supplied proof of the firearm offenses. He also contends insufficient evidence supports his negligent discharge conviction. Finding no merit to his contentions, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A

*The Events Of January 2023*

On January 25, 2023,[2] Sacramento County Sheriff's deputies responded to a report of a domestic violence threat at an apartment complex in Sacramento. M.D. told deputies that defendant, her boyfriend, had threatened her in a text message. M.D. claimed that defendant was in possession of multiple firearms and that three weeks prior he had threatened her with a firearm and had punched and choked her. While speaking with the deputies, defendant contacted M.D. via FaceTime and he appeared to have two real firearms with him in his vehicle. She took blurry screen shots of defendant and gave them to the deputies. She also provided the deputies with screenshots and recorded audio from her messages with defendant on his cell phone.

The following day, January 26, Deputy Aaron Muradyan pulled defendant over while driving and arrested him for the domestic violence incident involving M.D. the previous night; defendant was the only person in the car. At the time, defendant was on felony searchable probation with an electronic search condition. A cell phone actively being used for GPS navigation, a scale, and various drugs were found in the car, but no firearms were located. Defendant denied the phone was his and refused to provide the

---

[2] All further date references are to 2023 unless otherwise noted.

passcode to access the phone.  Detective Steve Hernandez collected the phone as evidence.

B

*The Domestic Violence Case*

On January 30, four days after his arrest, defendant was arraigned on a felony complaint in Sacramento County case No. 23FE001364 (the domestic violence case), alleging that on or about January 10 defendant had made criminal threats against M.D. and had unlawfully inflicted a corporal injury on her, and that on or about January 26,[3] defendant had made criminal threats against M.D. and had unlawfully possessed cocaine and oxycodone for sale.

Ten days later, on February 9, defendant pled no contest to the inflicting a corporal injury on January 10, and the remaining counts were dismissed.  On March 1, the trial court suspended imposition of sentence and placed defendant on two years of formal probation with various terms and conditions, including 364 days in county jail.

C

*Investigation And Prosecution Of The Firearm Case*

After confiscating defendant's cell phone, Detective Hernandez submitted it to a technician for a forensic analysis to extract data from the phone without the passcode.  By the end of February or early March, the extraction process revealed the phone's passcode, which allowed Detective Hernandez to fully access the phone to examine its contents.  In doing so, he found several date- and time-stamped videos on the phone.[4]

One video recorded around 6:39 p.m. on January 1 showed defendant holding a pistol with an extended translucent magazine.  Inside the see-through magazine, there were "ammunition stampings on the back of the casing of the live ammunition."  Based

---

[3]     Defendant was arrested with drugs in his car on January 26, but M.D. reported the domestic violence incident on January 25.

[4]     The jury reviewed these videos during trial.

on his training and experience, Detective Hernandez explained that the caliber of the bullets in the magazine was "40 Smith & Wesson" and that there were two different brands of ammunition visible in the magazine.

Detective Hernandez also found four videos recorded on January 7. In one of the videos taken around 6:12 a.m., defendant is seen "cycling live rounds" out of a "polymer 80 firearm." In another video, recorded around 7:35 a.m., defendant is holding what appears to be the same firearm from the previous videos demonstrating its "night sights" and "combination laser light attachment." A video recorded at 7:37 a.m. shows defendant demonstrating the attachment and removing the pistol magazine from what appears to be the same gun. A fourth video from January 7 shows defendant wearing distinctive clothing.

Detective Hernandez located another video taken on January 8 at 1:56 a.m. In the video, defendant is wearing the same distinctive clothing from the previous video and is holding a firearm at the apartment complex. It is dark and lightly raining. It appears defendant is recording the video on his cell phone while his phone light is on, and he then discharges the firearm four times in an unknown direction.

Upon recognizing the apartment complex in the video, Detective Hernandez investigated whether any 911 calls regarding the complex were received around 2:00 a.m. on January 8, and discovered that a 911 call had been made on that date. In April, he interviewed several residents of the apartment complex regarding the shooting that he believed occurred there on January 8. He also collected shell casings that one witness had picked up from the parking lot following the shooting.

On April 21 defendant was charged in case No. 23FE005693 (the firearm case) with negligently discharging a firearm on or about January 8 and being a felon in possession of a firearm on or about and between January 1 and January 8 based on the videos Detective Hernandez had found following the forensic analysis of defendant's phone. The information also alleged two circumstances in aggravation—that defendant

was on probation when he committed the offenses and that his participation on probation had been less than satisfactory. (Cal. Rules of Court, rule 4.421(b)(4), (b)(5).)

D

*Defendant's Motion To Dismiss Under* Kellett

Defendant moved to dismiss the firearm charges under section 654 and our Supreme Court's decision in *Kellett*, *supra*, 63 Cal.2d 822, arguing it constituted a successive prosecution of offenses arising from the same act or course of conduct as his earlier domestic violence case. Defendant argued that the prosecution was aware of the evidence and facts showing he possessed and discharged the firearm on or about January 8 when it charged and prosecuted him with domestic violence in the earlier case. Because the domestic violence case resulted in a conviction and sentence, and the prosecution failed to allege all offenses in a single criminal proceeding, defendant argued that section 654 barred the subsequent prosecution for the firearm offenses.

The prosecution opposed the dismissal motion, asserting the two prosecutions did not arise out of the same act or course of conduct, that the prosecution did not have actual knowledge, nor should it have, of the multiple prosecutions, and that it would be grossly unjust for defendant to escape prosecution for the firearm charges. According to the prosecution, the alleged incidents involved different dates, times, and victims.

At the hearing on the *Kellett* motion, defense counsel argued that the firearm case arose out of the same course of conduct as the domestic violence case because "they share the common denominator of the phone." Defendant's cell phone, in counsel's view, "plays a crucial role in the domestic violence case with the complaining witness in that case constantly referencing the phone and texts sent over the phone, videos over the phone, and the whole reason why the police collected the phone as evidence stems from [M.D.'s] comments about [defendant's] phone." Given the "similar time lines," counsel asserted that the facts in the firearm case "somewhat line up with the facts that are in the domestic violence case."

5

The prosecution argued that dismissal under section 654 and *Kellett* was not required where, like here, evidence connected to one crime, such as defendant's cell phone, was tested months later and connected to a second criminal offense. Under such circumstances, a defendant's plea to the first crime did not bar a later prosecution for the second crime after the subsequent discovery of the evidence linking the defendant to the second crime.

The trial court denied the motion, finding that section 654 and *Kellett* did not preclude prosecution for the firearm offenses, nor did trying both cases amount to the harassment of defendant. The court noted that the domestic violence case did not include any firearm enhancements and, because defendant's cell phone had to undergo a further extraction process before the sheriff's department could fully access its contents, the evidence relative to the possession and discharge of the firearm in the subsequent prosecution was not readily available to the prosecution at the time of filing the domestic violence complaint and defendant's almost immediate no contest plea in that case. The court further found that shooting a firearm in a parking lot sometime between January 1 and January 8 and the domestic violence incidents, which occurred on January 10 and January 25, did not make the offenses so interrelated that the two prosecutions ran afoul of *Kellett* or section 654.

E

*Subsequent Trial Court Proceedings In The Firearm Case*

At trial, Deputy Muradyan testified regarding locating the cell phone in the vehicle defendant was driving when he was arrested. Detective Hernandez testified about conducting a forensic analysis of the phone in order to access the above-described videos, which showed defendant possessing and discharging a firearm between January 1 and January 8. He also testified that the apartment complex where the shooting occurred had over 200 units and was located next to another nearly identical apartment complex. The apartment complex was located in a busy area of town and next to a business plaza or shopping center.

6

A resident of the apartment complex testified that she called 911 around 2:00 a.m. on January 8 to report hearing several gunshots coming from the parking lot of the complex. Although it was dark outside, she noticed what appeared to be a person in the parking lot holding a flashlight, although she could not see any distinguishing features. She did not see any cars driving away. Neither she nor her property were damaged from the incident. An audio recording Detective Hernandez played for her during the April 2023 interview sounded like the three or four gunshots she reported hearing on January 8.

A second resident testified that very early on January 8 he heard at least three gunshots. Although he was not injured during the shooting, the shots were "close enough to wake [him] up" inside his apartment. When it was light outside, he went to the parking lot to see if he could determine how close the shots were to his apartment building and he found four shell casings near the laundry room, which he picked up in case the police ever asked about them. He eventually gave the shell casings to the apartment manager. Detective Hernandez interviewed the resident about the incident in April 2023, and he showed the detective where he found the shell casings in the parking lot.

A third resident testified that late on January 7 or early on January 8, he heard at least four, possibly five, loud gunshots right next to his bedroom window. Based on the sound, he believed the gunshots were aimed "directly towards" his window. Being familiar with firearms, the gunshots frightened him, and he ducked and got on the ground. When he went outside in the morning, he saw several shell casings in the parking lot. He called 911 to report what he found and took pictures of the casings, which he later shared with Detective Hernandez in April 2023. He was not injured in the shooting and his property was not damaged.

Detective Hernandez testified that the four expended .40-caliber shell casings he collected from the apartment complex had the same stamping as the rounds that were seen in the videos taken from defendant's phone. Based on his experience with firearms, Detective Hernandez testified that if someone were to shoot bullets into the air, they

7

would come down with a velocity that could harm someone. He also testified that if someone shot at the ground of a paved parking lot, like the one at the apartment complex, the bullet could ricochet and hit someone. And, if someone shot "straight out," the bullet could hit someone who was not a target and simply a bystander in the area. In his experience, bullet wounds can cause serious injury or death.

The jury found defendant guilty as charged in the firearm case. In a bifurcated proceeding, the trial court found the aggravating circumstances true.

The trial court sentenced defendant to the low term of one year four months for the negligent discharge conviction and a consecutive eight months (one-third the midterm) for the felon in possession of a firearm conviction for an aggregate term of two years in prison, which was consecutive to a one-year term imposed for a drug offense in case No. 21FE002911. Defendant's total aggregate term was three years in prison. The court imposed various fines and fees and awarded defendant credits.

Defendant appeals.

DISCUSSION

I

Kellett *Motion To Dismiss*

Section 654 prohibits not only multiple punishments for a single act or indivisible course of conduct but also multiple prosecutions. The statute provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. *An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other*." (§ 654, subd. (a), italics added.) Under this section, double prosecution may be precluded even when double punishment is permissible. (*People v. Ochoa* (2016) 248 Cal.App.4th 15, 27.) We review the legal question of whether section 654 applies de novo. (*People v. Valli* (2010) 187 Cal.App.4th 786, 794.)

In *Kellett*, our Supreme Court held that when "the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Kellett*, *supra*, 63 Cal.2d at p. 827.) "This procedural rule is designed to prevent harassment and to save both the state and defendants time and resources." (*In re Dennis B.* (1976) 18 Cal.3d 687, 692.)

Appellate courts have developed two tests to determine whether the *Kellett* rule applies. Under one test, courts have found *Kellett* inapplicable where the offenses occurred at different times and locations. (*People v. Valli*, *supra*, 187 Cal.App.4th at p. 797.) Under the other test, the *Kellett* rule will not apply unless the " 'evidence needed to prove one offense necessarily supplies proof of the other.' " (*Valli*, at p. 799.) This evidentiary test " ' "requires more than a trivial overlap of the evidence. Simply using facts from the first prosecution in the subsequent prosecution does not trigger application of *Kellett*." ' " (*People v. Linville* (2018) 27 Cal.App.5th 919, 931.)

Under either test, we find no error. As the trial court noted, defendant's domestic violence offense and his firearm offenses occurred at different times and in different locations. Defendant was charged with threatening and committing acts of domestic violence against M.D. on January 10 and January 25. He was accused of unlawfully possessing a firearm between January 1 and January 8 and negligently discharging a firearm in the apartment complex's parking lot on January 8. Defendant, moreover, was charged and arraigned in the domestic violence case four days after his arrest on January 26 and he pled to one corporal injury offense 10 days later—approximately one month before the sheriff's department was able to fully access his cell phone to discover the videos defendant had taken of himself possessing and firing a gun on and between January 1 and January 8, the basis of the charges in the firearm case.

Alternatively, minimal overlapping evidence existed between the cases. Video evidence that defendant possessed a firearm between January 1 and January 8 and discharged a firearm in a parking lot on January 8 did not supply proof that defendant inflicted a corporal injury on M.D. two days later on January 10 or several weeks later on January 25. While M.D. did apparently show deputies some messages she had received from defendant's cell phone when she first made a domestic violence report, nothing in the record establishes that what M.D. showed the deputies was introduced at defendant's trial on the firearm offenses. Thus, while defendant's cell phone may have played a role in each prosecution, the overlap of evidence was minimal. (*People v. Linville*, *supra*, 27 Cal.App.5th at p. 931 [simply using facts from first prosecution in second prosecution does not trigger *Kellett* rule].)

Finally, as the trial court noted and the People point out, the sheriff's department had no reasonable knowledge or ability to prosecute all offenses in a single proceeding. Defendant himself refused to provide the sheriff's department with his passcode as required by the terms of the electronic search condition of his probation, which delayed the detective from discovering, collecting, and investigating the video evidence later extracted from his phone following a forensic analysis. Had defendant timely provided his passcode, the videos could have immediately been discovered and the firearm offenses could have been charged together with the domestic violence offenses in a single prosecution. *Kellett*, however, was not designed to shield a defendant from later prosecution for criminal acts where his own conduct improperly delayed the discovery of such criminal acts. Defendant is not entitled to such a windfall.

II

*Substantial Evidence*

Defendant argues that his conviction for negligently discharging a firearm must be reversed because there was no evidence as to the direction the firearm was discharged or whether the rounds discharged were live rounds. He contends that based on the evidence, the jury could not determine beyond a reasonable doubt that the weapon was discharged

10

in such a manner as to create an immediate danger of injury or death. We disagree, finding substantial evidence supports the jury's verdict.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27), resolving all conflicts in the evidence and drawing all reasonable inferences to support the conviction (*People v. Campbell* (1994) 25 Cal.App.4th 402, 408; *People v. Small* (1988) 205 Cal.App.3d 319, 325 ["The substantial evidence rule is generous to the respondent on appeal"]). We do not reweigh the evidence or reevaluate a witness's credibility (*Lindberg*, at p. 27), and " 'may conclude that there is no substantial evidence in support of conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant guilty on the theory presented' " (*Campbell*, at p. 408). "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Lindberg*, at p. 27.)

The jury found defendant guilty of violating section 246.3, subdivision (a). Section 246.3, subdivision (a), states: "Except as otherwise authorized by law, any person who willfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a public offense and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of [s]ection 1170."

To prove defendant guilty of the grossly negligent discharge offense, the trial court instructed the jury that the prosecution had to prove, in relevant part: (1) "defendant intentionally shot a firearm"; (2) "defendant did the shooting with gross negligence"; and (3) "[t]he shooting could have resulted in the injury or death of a person." "Gross negligence," in turn, meant that defendant "act[ed] in a reckless way

11

that create[d] a high risk of death or great bodily injury" and that "[a] reasonable person would have known that acting in that way would create such a risk. (See also *People v. Ramirez* (2009) 45 Cal.4th 980, 990 [explaining that to prove a violation of § 246.3, subd. (a), the prosecution is not required to show that an identifiable person was actually in danger of injury or death from the defendant's grossly negligent shooting; it is sufficient to prove it was reasonably foreseeable that human injury or death might result under the circumstances].)

Here, defendant fired a gun four times in a highly populated residential area, presenting a high risk of serious injury or death rising to the level of gross negligence under section 246.3. Detective Hernandez testified that defendant fired the gun in the parking lot of the apartment complex, which was located in a "busy area" of town. The apartment complex itself had over 200 residential units, and it was next to a similarly large apartment complex and across the street from a shopping center or business plaza. Shell casings were found in the parking lot near the laundry room of the complex, and at least one resident said the shots were so loud that he believed the person was firing directly outside his window, causing him to fear for his life and get on the ground.

The jury reasonably could have found that firing a gun under those circumstances, no matter which direction the gun was pointed, was grossly negligent because defendant created a high risk of death or serious bodily injury to members of the public. The jury reasonably could have inferred that any number of residents could have been walking through the complex or sitting in their cars at the time of the shooting. (*People v. Ramirez*, *supra*, 45 Cal.4th at p. 987 [§ 246.3's "risk element requires the likely presence of people in the area, not the actual presence of a specific person"].) Indeed, several residents were in fact home in their apartments when the shooting occurred and were frightened by the proximity of the gunshots.

Detective Hernandez further testified that bullet wounds can be deadly, and that shots fired directly at an object, in the air, or that ricochet off pavement or other nearby structures could travel with such velocity as to seriously injure or kill innocent

bystanders.  (See, e.g., *People v. Alonzo* (1993) 13 Cal.App.4th 535, 537, 540 [shooting a gun several times into the air in a commercial area not only presented the possibility of hitting a member of the public, it also presented the very real possibility of generating responsive gunfire; the fact that the gun was pointed up in the air was precisely the type of behavior the statute was intended to deter].)  He also testified that the four expended .40-caliber shell casings found at the scene bore the same manufacturer's stamping as the rounds in the translucent magazine seen in videos taken from defendant's phone.  Based on the totality of the evidence, the jury reasonably could find that defendant acted with gross negligence by shooting live rounds from a firearm four times in the paved parking lot of a crowded residential apartment complex located in a busy part of town.

DISPOSITION

The judgment is affirmed.


/s/
ROBIE, Acting P. J.


We concur:


/s/
MAURO, J.


/s/
DUARTE, J.


13