Filed 4/12/23  P. v. Barness CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>ADAM BARNESS,<br><br>    Defendant and Appellant. | F083479<br><br>(Super. Ct. No. BF172396A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Adam Barness (defendant) was pulled over by a California Highway Patrol (CHP) officer for speeding.  The officer discovered (1) the vehicle had been reported stolen and

(2) there was a dead body in the front passenger seat. Defendant was arrested, and a search of the vehicle produced evidence of his involvement in a homicide.

Defendant was promptly charged with receiving a stolen vehicle. He pled nolo contendere, and the case was resolved within three weeks of his arrest. A few months later, he was charged with murder and conspiracy to commit murder. Defendant moved to dismiss the murder case pursuant to the general requirement of Penal Code section 654, as interpreted by *Kellett v. Superior Court* (1966) 63 Cal.2d 822 (*Kellett*), that offenses arising from the same act or course of conduct must be prosecuted in a single proceeding. (Undesignated statutory references are to the Penal Code.) This appeal concerns the denial of defendant's *Kellett* motion. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On the morning of January 16, 2018, a CHP officer was patrolling State Route 65 near James Road on the outskirts of Bakersfield. This rural segment of the north/south highway has only two lanes, one for each direction of travel. Shortly before 7:00 a.m., the officer initiated a traffic stop of a white GMC Yukon traveling southbound at 74 mph in a 55 mph zone. A portion of the vehicle had been spray-painted black, and it had only a paper "dealer plate" advertising the name of an automotive business. Defendant was in the driver's seat, and there appeared to be two additional male occupants.

Defendant falsely identified himself as "Ben Barness," providing the name and address of a person later determined to be a sibling who lived in North Hollywood. Defendant claimed to have left his wallet at home and was unable to produce any documentation for the vehicle. The officer asked, "Where are you guys coming from?" Defendant replied, "Los Angeles." When the officer pointed out the inconsistency in their direction of travel, defendant and his rear passenger, Manpreet Sidhu, claimed they had recently turned around in search of a gas station.

The officer located the vehicle identification number (VIN) and returned to his patrol car to perform a VIN check. He discovered the GMC Yukon had been reported

2.

stolen in Los Angeles approximately five weeks earlier. Following the arrival of backup officers, defendant and Sidhu were ordered out of the vehicle and arrested. The man in the front passenger seat (the victim) failed to respond to verbal commands.[1]

The officers soon realized the victim was dead. A Mobile Video/Audio Recording System (MVARS) recorded one officer commenting that rigor mortis had already set in. The victim's right arm was noted to be positioned "under the lap portion" of the seat belt, which the officers interpreted to mean "he didn't sit himself in the seat."

The arrestees were taken into custody by the sheriff's department. The GMC Yukon was seized and searched. Investigators found multiple firearms, a shovel, a can of gasoline, three cans of spray paint, methamphetamine and smoking paraphernalia, a black ski mask, and a "fingerless glove." Inside the rear seat pocket of the driver's seat was a matching glove and a braided metal wire. In addition, there was mail and miscellaneous documents addressed to "Adam Barness." Several items were swabbed for deoxyribonucleic acid (DNA) testing.

Defendant invoked his right to remain silent, but he complied with a search warrant for his DNA. Sidhu waived his rights and claimed ignorance of any wrongdoing except for defendant's speed violation. He described defendant as a casual acquaintance known to him as "Beto" or "Guero," but whose real name was possibly Adam. Sidhu had allegedly met defendant a few months earlier through a man he called "Gatto."

According to Sidhu's initial story, defendant picked him up from a certain 7-Eleven convenience store in South Los Angeles sometime between 3:00 a.m. and 4:00 a.m. on the day of their arrest. There were vague allegations of a prearranged plan for defendant to give Sidhu a ride to Sidhu's parents' home in Bakersfield. Sidhu had seen

_____

[1]We are unable to confirm the victim's name from the record on appeal. He is variously identified therein as Evmir Flores, Evmir Miraflores, Evangelista Miraflores, Evmir Evangelista Miraflores, and Evmir Miraflores Evangelista.

defendant drive the GMC Yukon on prior occasions, and he was under the impression defendant was a "rich guy" who owned multiple cars.

Sidhu denied knowing the victim. He claimed the victim was already in the front passenger seat of the Yukon when defendant arrived at the 7-Eleven. Defendant told Sidhu that his "buddy" was sleeping, and Sidhu had paid no further attention to the man.

At the end of the interview, Sidhu advised that his DNA would likely be found on the metal wire discovered inside of the Yukon. He explained that the item was "on the seat" when he first entered the vehicle, and he had touched it. Subsequently, on a date not specified in the record, detectives obtained store surveillance footage from the time of Sidhu's alleged meet-up with defendant at the 7-Eleven. The video reportedly showed Sidhu getting into the driver's seat of a Nissan sport utility vehicle and driving out of the parking lot.

On January 18, 2018, an autopsy was performed on the victim. A homicide detective from the Kern County Sheriff's Office attended the examination. The victim was noted to have abrasions on his face and the inside of his lip. There was an apparent ligature mark across his neck. The cause of death was determined to be ligature strangulation.

The detective showed the coroner a photograph of the metal wire found inside of the GMC Yukon. The coroner opined the victim's injuries could have been caused by the wire. At the detective's request, swab samples were taken from the victim's face and neck for DNA testing.

On January 22, 2018, in Kern Superior Court case No. BF170970A (BF170970A) the district attorney filed a criminal complaint accusing defendant of receiving a stolen vehicle (§ 496d). Despite the evidence indicating defendant's true name was Adam, the charge was filed against "Ben Barness." Defendant, in turn, continued to impersonate his brother. On February 2, 2018, he entered a plea of nolo contendere as "Ben Barness,"

4.

signing that name on a plea form and using the letters "BB" to initial next to written acknowledgments and waivers.

On March 6, 2018, defendant was sentenced to 100 days in jail, with credit for time served, and was granted probation. He was released from custody the same day. The trial court stated it was "not considering the surrounding facts and circumstances of the body in the car." The court's reason for not considering those details was to avoid a "serious *Kellett* issue" in the event prosecutors later attempted "to file additional charges based on the evidence."

According to a criminalist involved in the DNA testing, the Kern Regional Crime Lab reported the test results sometime "around March of 2018." It is unclear from the record whether the results were available to prosecutors before the judgment was entered in case BF170970A. The testing matched defendant's DNA to swab samples taken from the victim's face. The victim's DNA was found on the middle portion of the metal wire and exterior portions of the gloves seized from inside the GMC Yukon. Sidhu's DNA was found on the ends of the metal wire, as well as on interior and exterior portions of the gloves.

On May 29, 2018, in Kern Superior Court case No. BF172396, a criminal complaint was filed charging Sidhu and "Ben Barness" with murder (§ 187) and conspiracy to commit murder (§§ 182, subd. (a)(1), 187) in connection with the victim's death. On or about the same date, police arrested the real Ben Barness, i.e., defendant's brother. At the urging of the brother's legal counsel, the authorities conducted a fingerprint analysis and defendant's ruse finally came to light.

On June 4, 2018, an amended complaint was filed in the murder case to correct the name discrepancy. Defendant was additionally charged with preparing false evidence (§ 134) and false personation (§ 529, subd. (a)(2)). He appeared in court the same day and answered to his true name.

5.

After being charged with murder, Sidhu agreed to a second interview with detectives. He now admitted to having previously met the victim while accompanying defendant on a drug-related errand. The victim had allegedly owed money to the man Sidhu called "Gatto," and defendant had collected the money on Gatto's behalf. Sidhu provided details about a residence occupied by a female, which was consistent with the victim's living arrangements. One of the detectives said, "You just described his house to us." It was unclear from Sidhu's story when the prior incident had occurred.

Sidhu had previously described Gatto as an "Indian guy" who was both a friend and neighbor. In his second interview, he again called Gatto his "friend" but also alleged Gatto was a member of the "Florence gang" who sold illegal narcotics and had a tattoo of the letter F on his face. Sidhu maintained defendant was a mere acquaintance with whom he occasionally got high. Defendant was portrayed as a "rich guy" with an affinity for cars, guns, and recreational drugs.

Unaware detectives had already viewed the 7-Eleven surveillance footage, Sidhu continued to allege he met with defendant at the store on the day of their arrest. As before, he denied knowing how or when the victim had died. This time, however, he also denied having ever touched the metal wire.

A preliminary hearing commenced in February 2019, but only two witnesses testified before the parties agreed to continue the proceedings. The hearing resumed in June 2019, at which time the People introduced evidence defendant and the victim had worked together at Cedars-Sinai hospital in Los Angeles. The victim had a life insurance policy through his employer, and he had named defendant as the beneficiary in May 2017. The victim was known to drive a vehicle described by his coworkers as "an older white Jaguar," and defendant had registered a white 2003 Jaguar in his own name in

March 2018, i.e., two months after the victim's death. The record does not indicate when the prosecution discovered the evidence of defendant's connection to the victim.[2]

In July 2019, defendant and Sidhu were charged by information with premeditated murder (count 1) and conspiracy to commit murder (count 2). Defendant was additionally charged with false personation (count 3), preparing false evidence (count 4), and receiving stolen property (count 5). Count 5 was included because the prosecutor believed the proceedings in case BF170970A were "invalid" since defendant had pretended to be his brother.

Defendant moved under section 995 to set aside the information for lack of probable cause. He filed a separate motion to dismiss counts 1 and 2 based on sections 654 and 954, and the *Kellett* decision. The People opposed both motions.

In November 2019, on the day of the motion hearings, defendant pled no contest to count 3 in exchange for an agreed-upon jail sentence of 90 days (with credit for time served), a grant of probation, and the dismissal of count 4. Count 5 was also dismissed pursuant to a stipulation regarding the judgment against him in case BF170970A. (See §§ 953, 960.) As to the remaining counts, both defense motions were summarily denied.

In late 2021, following delays partially attributable to the COVID-19 pandemic, defendant and Sidhu were jointly tried before a jury. On the second day of trial, the People filed an amended information to allege overt acts in connection with the conspiracy charge.[3] The amended portion of count 2 read as follows:

> "Overt Act #1: The defendants met on January 15, 2018–January 16, 2018, in Los Angeles County, California. Overt Act #2: One [or] both of the defendants picked up [the victim]. Overt Act #3: One [or] both of the

[2]In subsequent pretrial filings, the prosecution repeatedly alleged defendant "was in a homosexual dating relationship with the victim." The defense successfully moved in limine to preclude such allegations from being made at trial.

[3]The People did not delete counts 3, 4, and 5 from the amended pleading. However, only counts 1 and 2 were submitted to the jury.

7.

defendants killed [the victim] while [the victim] was inside the GMC Yukon. Overt Act #4: The defendants traveled to Kern County, California, to dispose of [the victim's] body. Overt Act #5: The defendants tried to hide the fact [the victim] was dead [from the CHP officer who made the traffic stop]." (Some capitalization omitted.)

The People's trial evidence established the facts summarized above. Testimony from Cedars-Sinai employees showed the victim was at work on the night of January 15, 2018, and "clocked out" at approximately 10:45 p.m. His roommate testified that he never returned home. The roommate had waited up for him and sent a text message to his phone at approximately 2:00 a.m., but he did not respond.

The victim's departure from work at around 10:45 p.m. meant he was killed during a subsequent eight-hour window of time. Despite alleging the victim was "picked up" by defendant and/or Sidhu, the People offered no theory as to when or where the meeting took place. The murder was alleged to have occurred inside the GMC Yukon sometime after midnight and "more recent to when [the CHP officer] pulled them over."[4]

Defendant did not testify at trial. His defense counsel argued Sidhu acted alone in killing the victim. Counsel proposed a scenario in which Sidhu had suddenly and unexpectedly strangled the victim from behind "10 or 15 minutes, 20 minutes before the car was pulled over." It was suggested Sidhu may have experienced temporary psychosis from the effects of methamphetamine. But this theory did not explain why the victim was found with his right arm belted underneath the lap portion of his seat belt.[5]

---

[4]It is unclear whether the prosecutor expected jurors to assume the victim was "picked up" from Cedars-Sinai in the GMC Yukon, but the assumption would have been speculative. There was no evidence regarding how the victim normally traveled to and from work, but his roommate testified he drove a white Jaguar. Detectives believed he was still driving the Jaguar "at or near the time of his death," but they were unable to locate it during their investigation. Incidentally, trial evidence revealed the car actually belonged to a third party whose relationship to the victim was never explained. The registered owner sold the Jaguar to defendant in March 2018.

[5]The prosecutor's theory arguably failed to account for this important detail as well. While discussing the presence of defendant's DNA on the victim's face, the prosecutor argued

Sidhu testified and blamed everything on defendant. His testimony began with a convoluted story about being victimized in an extortion scheme carried out by defendant and "Gatto." When he initially refused to comply with their demands, defendant beat him with a baseball bat. Sidhu was then forced, under threat of additional physical harm, to serve as an illegal narcotics courier. In this version of events, defendant was a high-ranking gang member and Gatto was his "right-hand man."

Sidhu went on to allege defendant contacted him on January 16, 2018, at around 4:00 a.m., with instructions to meet him at a house in Burbank. Sidhu first went to the 7-Eleven where he worked in search of a ride. Unable to find someone to help him (he did not want to illegally drive without a license), Sidhu drove himself to Burbank in a Nissan Xterra—a vehicle defendant had previously given to him for the purpose of transporting narcotics. He arrived at the meeting place to find defendant, Gatto, and the victim in a cul-de-sac area. The victim, who appeared to be in a drug-induced stupor, was already seated inside of the GMC Yukon.

According to the testimony, defendant and Gatto led Sidhu to a Ford Expedition parked nearby and essentially tricked him into handling the gloves and metal wire that were used to kill the victim. Defendant ordered Sidhu to strangle the victim, but Sidhu refused. Defendant eventually strangled the victim himself and then instructed Sidhu to drive the victim's white Jaguar to a parking lot a few miles away. Sidhu did as he was told and was then forced to accompany defendant on the drive to Kern County. Defendant had allegedly claimed to have people waiting for him in Shafter to dispose of the body.[6]

---

the DNA was found "[r]ight where, if you're driving, you take your right hand and hold him down [while he is being strangled from behind]."

[6]Sidhu further testified to defendant claiming ownership of the Jaguar and making comments about not allowing the victim "to put the car in his name." The Jaguar was parked on the "other side of Burbank Boulevard" at the time of the murder. Sidhu then moved it to a parking lot on Lankershim Boulevard, and from there he and defendant traveled north in the

Defendant and Sidhu were both found guilty as charged. For the crime of first degree murder, defendant was sentenced to a prison term of 25 years to life. The same sentence was imposed for the conspiracy conviction but stayed pursuant to section 654.[7]

A notice of appeal was filed on the date of sentencing.

## DISCUSSION

The sole issue on appeal is whether defendant's *Kellett* motion was properly denied.

**Applicable Law**

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. *An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other*." (Italics added.) In *Kellett*, the California Supreme Court analyzed the meaning of substantially similar language in a former

GMC Yukon. When asked about the shovel and can of gasoline found inside of the Yukon, he claimed to believe those items had nothing to do with the planned disposal of the victim's body.

[7]The following should be noted regarding the imposed punishment. During the initial traffic stop, defendant said that he was born in May 1994. In other words, he claimed to be 23 years old. After being taken into custody, and while still pretending to be his brother, he at different times purported to verify dates of birth in May 1994 and May 1993. The abstract of judgment in this case provides a birthdate of May 1993, which would mean the offenses were committed a few months prior to defendant's 25th birthday. The probation report confusingly lists two dates of birth, one in February 1988 and another in May 1993. But it states defendant was 33 years old at the time of sentencing, thus indicating the 1988 date is accurate and he was 29 years old at the time of the offenses. It is unclear from the appellate record whether any of those birthdates are in fact correct. However, the probation report attributes statements to defendant regarding things he did between the ages of 29 and 30, which further calls into question the birthdate listed in the abstract of judgment. Although defendant's age is not relevant to the claims in this appeal, it may be an issue of importance regarding his future parole eligibility. (See §§ 3051, 3055.) Concerned parties may therefore wish to investigate and confirm the information.

10.

version of the statute. (*Kellett*, *supra*, 63 Cal.2d at p. 824, fn. 1.) The holding is as follows:

> "[If] the prosecution is or should be aware of more than one offense in which the same act or course of conduct *plays a significant part*, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Id.* at p. 827, italics added.)

The *Kellett* defendant was arrested while "standing on a public sidewalk with a pistol in his hand." (*Kellett*, *supra*, 63 Cal.2d at p. 824.) After being convicted of a misdemeanor brandishing offense, he challenged a separately filed felony gun possession charge based on the same incident. The second prosecution was held to violate the above-quoted rule. The holding rested on two policy considerations: (1) the need for "'a procedural safeguard against harassment'" of criminal defendants and (2) protection of the "public fisc." (*Id.* at pp. 825, 826.) "If needless harassment and the waste of public funds are to be avoided, some acts that are divisible for the purpose of punishment must be regarded as being too interrelated to permit their being prosecuted successively." (*Id.* at p. 827.)

Recent appellate court decisions speak of two different tests for determining whether the *Kellett* rule has been violated: a "'time and place test'" and an "'evidentiary test.'" (E.g., *People v. Ochoa* (2016) 248 Cal.App.4th 15, 28–29.) It may be more accurate to say the relevant cases fall into two general categories. In the first category of cases, the fact patterns are clearly distinguishable from the singular act of gun possession at issue in *Kellett*. In the second category of cases, which tend to involve closer questions of interrelatedness, reviewing courts have focused on "the evidence necessary to prove the offenses." (*Ochoa*, at p. 29.)

An early decision in the first category of cases is *People v. Douglas* (1966) 246 Cal.App.2d 594 (*Douglas*). After committing a series of robberies "on various dates

11.

from June 29, 1958, to October 10, 1958," William Douglas and Bennie Meyes engaged in a "gunfight" with police officers who were attempting to arrest them for the robberies. (*Id*. at pp. 595–596.) The gunfight, which happened on October 20, 1958, resulted in the death of an officer. "Douglas and Meyes were indicted for the murder of the officer, and, after two trials, … Douglas was acquitted and Meyes was convicted of second-degree murder." (*Id*. at p. 596.) In a subsequent prosecution, both men were convicted of robbery and assault based on events preceding the homicide. (*Ibid*.)

On appeal, Douglas and Meyes argued "there was something unfair or unconstitutional in the initiation of a prosecution against them for earlier robberies and assaults after they had stood trial for a later murder." (*Douglas*, *supra*, 246 Cal.App.2d at p. 598.) The appellate court quoted the *Kellett* holding before rejecting the claim for these reasons:

> "[The *Kellett*] rule is designed to cover prosecutions for offenses arising out of the same act. But in the present case defendants were prosecuted for unrelated offenses arising from separate physical acts performed at different times. A murder, a robbery, an assault, like every other action, normally has a beginning, a duration, and an end, and where, as here, none of these overlap, simultaneous prosecution is not required under any present theory of jurisprudence. The offenses found too closely related in *Kellett* to be prosecuted separately arose at the same moment in time and were based on a single act—brandishing a pistol—whence came both the charge of exhibiting a firearm in a threatening manner and the charge of possession of a concealable weapon by a felon." (*Douglas*, *supra*, at p. 599.)

A notable case from the second category of decisions is *People v. Flint* (1975) 51 Cal.App.3d 333 (*Flint*), which involved successive prosecutions for misdemeanor drunk driving and felony "theft and joy riding violations." (*Id.* at p. 335.) Police found the accused in the driver's seat of a Corvette, "which was straddling railroad tracks," at approximately 2:20 a.m. (*Ibid*.) The car had recently been stolen. There was evidence the theft may have occurred the previous day, but a court finding placed the times of the offenses within a window of 20 minutes. (*Id*. at pp. 334–335 & fn. 1.)

12.

In *Flint*, the People appealed from a dismissal "based on the prohibition against multiple prosecution contained in section 654." (*Flint*, *supra*, 51 Cal.App.3d at p. 334.) The order of dismissal was affirmed, primarily because "the same incident which furnished the evidence that defendant was driving in an intoxicated condition, also supplied proof that what he was driving was an automobile he had stolen. [Citation.] Further, it was obviously the impounded car which, when matched against the victim's crime report, triggered the theft prosecution." (*Id.* at p. 338.) The case stands for the following proposition:

> "Neither the purpose of the [*Kellett*] rule—prevention of needless harassment and waste of public funds; nor the criterion for its applicability—whether the same act or course of conduct plays 'a significant part' with respect to each crime—suggests that its applicability in a particular case depends on abstract definitions of the elements of the respective crimes or on the precise moment when, as a matter of law, one crime was completed. What matters, rather, is the totality of the facts, examined in light of the legislative goals of sections 654 and 954, as explained in *Kellett*." (*Flint*, at p. 336, fn. omitted.)

Some post-*Kellett* decisions by the California Supreme Court, including *People v. Carpenter* (1999) 21 Cal.4th 1016 and *People v. Marlow* (2004) 34 Cal.4th 131, generally fall into the first category of cases, i.e., are consistent with the *Douglas* line of authority. But in *People v. Britt* (2004) 32 Cal.4th 944, issued the same year as *Marlow*, a *Kellett* violation was found despite a lack of temporal or geographic proximity between the charged offenses. We will briefly summarize the facts and holdings of these opinions.

In *Carpenter*, where a serial killer appealed from the second of two death verdicts imposed by different juries, the high court disposed of the appellant's *Kellett* claim in a few short sentences. (*People v. Carpenter*, *supra*, 21 Cal.4th at pp. 1028–1029, 1038.) The underlying events had occurred over a period of weeks and in multiple locations. The opinion states, "Whatever the scope of [the *Kellett*] decision, the murder of separate

13.

victims on separate days in separate counties is not a single act or even 'course of conduct' [citation] requiring a single prosecution." (*Carpenter*, at p. 1038.)

The appellant in *Marlow* argued that "prosecutors in his Orange County and San Bernardino County cases each proceeded on the theory that the two murders had formed part of a single course of conduct, namely a 'unified plan' … to obtain money to finance a trip to Arizona." (*People v. Marlow*, *supra*, 34 Cal.4th at p. 143.) The high court gave short shrift to the claim: "Contrary to defendant's argument, *Kellett* is not controlling. As we noted in [*People v. Carpenter*, *supra*, 21 Cal.4th at page 1038], 'the murder of separate victims on separate days in separate counties is not a single act or even a "course of conduct" [citation] requiring a single prosecution.'" (*Marlow*, at p. 144.)

In *Britt*, a convicted sex offender had moved from Sacramento County to El Dorado County without notifying law enforcement officials in either jurisdiction as required by two different statutory provisions. The question on appeal was whether he could be "prosecuted and punished separately for each crime—once in the county of the former residence and once in the county of the new residence." (*People v. Britt*, *supra*, 32 Cal.4th at p. 949.) The offenses were not confined to a specific time and place, but they were held to be sufficiently interrelated under *Kellett* because "the same act or course of conduct—a single unreported move within California—played a significant part in both omissions." (*Britt*, at p. 954.)

The persisting notion of competing "tests" for resolving *Kellett* claims, which would suggest an unresolved split of authority, can be traced to *People v. Valli* (2010) 187 Cal.App.4th 786 (*Valli*). The *Valli* court observed that "[w]hether *Kellett* applies must be determined on a case-by-case basis." (*Id.* at p. 797, citing *People v. Britt*, *supra*, 32 Cal.4th at p. 955.) The next sentence of the opinion says, "Appellate courts have adopted two different tests to determine a course of conduct for purposes of multiple prosecution." (*Valli*, at p. 955.)

14.

Following a summary of the *Douglas* line of authority (what we have called the first category of *Kellett* decisions), the *Valli* opinion concludes the *Kellett* rule "is not necessarily a simple 'different time/different place' limitation." (*People v. Valli*, *supra*, 187 Cal.App.4th at p. 798.) We agree with this conclusion, as it is soundly based on the California Supreme Court's decision in *Britt*. (See *Valli*, at p. 798 [noting the crimes in *Britt* "occurred on separate occasions and in different counties"].) But whereas the *Valli* court implied it was choosing one analytical approach (the "evidentiary test") over another (the "separate times and locations" test) (*Valli*, at pp. 798–799), we interpret the outcome in *Britt* to mean there is no mechanical time-and-place test for resolving *Kellett* claims—at least outside the context of prosecutions for "the murder of separate victims on separate days in separate counties" (*People v. Carpenter*, *supra*, 21 Cal.4th at p. 1038).

The "evidentiary test" was labeled as such in *People v. Hurtado* (1977) 67 Cal.App.3d 633 by the same appellate court that decided *Flint*. (*Hurtado*, at p. 636.) Simply stated, "if the evidence needed to prove one offense necessarily supplies proof of the other, … the two offenses must be prosecuted together, in the interests of preventing needless harassment and waste of public funds." (*Ibid*.) The test requires "examining the totality of facts in light of section 654's legislative goals." (*People v. Linville* (2018) 27 Cal.App.5th 919, 934, citing *Valli*, *supra*, 187 Cal.App.4th at p. 799.) "Accordingly, courts will decline to apply the bar on successive prosecutions where doing so will not serve 'the policies underlying section 654'—namely, 'preventing harassment of the defendant and the waste of public resources through relitigation of issues ….'" (*Short v. Superior Court* (2019) 42 Cal.App.5th 905, 912, quoting *People v. Davis* (2005) 36 Cal.4th 510, 558 and citing *Linville*, *supra*, at p. 934.)

In summary, section 654 bars successive prosecution of joinable offenses if "the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays *a significant part*." (*Kellett*, *supra*, 63 Cal.2d at p. 827, italics

15.

added.) The prevailing framework for determining whether the *Kellett* rule has been violated is the so-called "'evidentiary test,'" which "looks to the evidence necessary to prove the offenses." (*People v. Ochoa*, *supra*, 248 Cal.App.4th at p. 29.) The test "requires more than a trivial overlap of the evidence," and "[s]imply using facts from the first prosecution in the subsequent prosecution does not trigger application of *Kellett*." (*Valli*, *supra*, 187 Cal.App.4th at p. 799.) "Ultimately, '[w]hat matters' in determining whether the bar against successive prosecutions applies 'is the totality of the facts, examined in light of the legislative goals of section[] 654 ….'" (*Short v. Superior Court*, *supra*, 42 Cal.App.5th at p. 912, quoting *Flint*, *supra*, 51 Cal.App.3d at p. 336.)

Additionally, "[t]he bar against successive prosecutions is subject to a judicially recognized exception for unavailable evidence." (*People v. Linville*, *supra*, 27 Cal.App.5th at p. 928.) "[T]he exception applies when the prosecutor "'"is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence."'"" (*Ibid*., quoting *People v. Davis*, *supra*, 36 Cal.4th at p. 558.) Furthermore, a defendant "will not be deemed 'harassed' under … section 654[] where the claimed harassment 'may be said to result from his own conduct.'" (*In re Troglin* (1975) 51 Cal.App.3d 434, 439.) The People's briefing argues both exceptions apply here, but we need not address those arguments to conclude defendant's *Kellett* motion was properly denied. (E.g., *Linville*, at p. 929.)

## A. Standard of Review

"On appeal, we review factual determinations under the deferential substantial evidence test, viewing the evidence in the light most favorable to the People. [Citation.] We review de novo the legal question of whether section 654 applies." (*Valli*, *supra*, 187 Cal.App.4th at p. 794.) "Generally, courts examine what the prosecution knew or should

have known before the date of the defendant's conviction in the earlier prosecution." (*People v. Ochoa*, *supra*, 248 Cal.App.4th at p. 38.)

### B. Analysis

The parties make flawed arguments with regard to the supposed "time and place" test. Defendant argues "the crime of possession of a stolen vehicle was ongoing from the moment [he] took physical control of the car, and it was during that period of control that the homicide was committed." The People claim "[t]he site where [the section 496d] offense occurred—on Route 65 in Bakersfield—was different than the location of the murder, which had taken place earlier and in a different place."

Section 496d "criminalizes buying or receiving stolen property," and "it applies specifically to buying or receiving a stolen 'motor vehicle ….'" (*People v. Orozco* (2020) 9 Cal.5th 111, 117.) Unlike most possessory crimes, receiving stolen property is not a continuing offense. (*People v. Grant* (2003) 113 Cal.App.4th 579, 595; see *People v. Valdez* (2017) 10 Cal.App.5th 1338, 1348 ["Possessory offenses, such as drug possession or possession of a deadly weapon, are '"continuing" offense[s], one[s] that extend[] through time' and create criminal liability 'throughout the entire time the defendant asserts dominion and control'"].) "The crime of receiving stolen property is complete when the defendant takes possession of property with knowledge it is stolen." (*Grant*, at p. 594.)

Although the GMC Yukon was reported stolen five weeks prior to defendant's arrest, and Sidhu claimed to have seen him drive it on prior occasions, the complaint in case BF170970A alleged defendant violated section 496d "on or about January 16, 2018." (Some capitalization omitted.) Defendant's plea and conviction merely established the truth of the allegation, meaning his receipt of the stolen vehicle occurred within hours of the victim's murder. Nothing in the appellate record shows both crimes were committed at the same time or in the same location.

17.

Defendant has a better argument for the charge of conspiracy to commit murder. "Although the crime of conspiracy requires only an agreement and an overt act, the conspiracy does not necessarily end on the commission of the first overt act. Instead, conspiracy is a continuing offense while the agreement continues." (*People v. Briones* (2008) 167 Cal.App.4th 524, 529; accord, *People v. Becker* (2000) 83 Cal.App.4th 294, 297–298 ["It is the classic example of a continuing offense because by its nature it lasts until the final overt act is complete"].) Given the People's reliance on overt acts alleged to have occurred before and after the victim's death, defendant's receipt of the stolen GMC Yukon likely happened during the course of the conspiracy. However, as discussed above, a *Kellett* analysis requires more than simply ascertaining when and where the offenses were committed. (See *People v. Britt*, *supra*, 32 Cal.4th at pp. 954–955; *Valli*, *supra*, 187 Cal.App.4th at p. 798.)

In terms of whether "the evidence needed to prove one offense necessarily supplies proof of the other," the People's reliance on *Hurtado* is persuasive. (*People v. Hurtado*, *supra*, 67 Cal.App.3d at p. 636.) There, a traffic stop initiated because of the driver's speed and erratic maneuvers turned into a drunk driving investigation when CHP officers "detected a strong odor of alcohol on his breath." (*Id.* at p. 635.) "Following a series of field sobriety tests, [the driver] was placed under arrest for drunk driving. Then, while [he] was being handcuffed, he was seen to take an object from his jacket and place it between his legs. The object—a cigarette package—was seized and found to contain 20 rolled balloons filled with a substance later determined to be heroin." (*Ibid.*)

The issue in *Hurtado* was whether, in light of the motorist's conviction on a drunk driving charge, a separate prosecution for felony narcotics offenses was barred by section 654 as interpreted by *Kellett* and *Flint*. The appellate court held it was not:

> "Examining this case in light of *Flint* we find that the evidentiary pictures which had to be painted to prove the drunk driving and narcotics offenses were sufficiently distinct so as to permit separate prosecutions of the two offenses. Proof of the drunk driving charge was supplied primarily by the

18.

observations of the highway patrol officers made after defendant was stopped and given certain sobriety tests. Proof of the heroin charges hinged upon the discovery of the cigarette package filled with heroin, *which occurred after the arrest for drunk driving had been made*. Evidence in the two cases[] was for the most part mutually exclusive, the only common ground being the fact that defendant was in the moving automobile in possession of the heroin at the same time that he was under the influence of alcohol. Such a trivial overlap of the evidence, however, under *Kellett* and *Flint* does not mandate the joinder of these cases." (*People v. Hurtado*, *supra*, 67 Cal.App.3d at pp. 636–637, italics added.)

Although defendant's possession of the GMC Yukon was critical to proving his receipt of a stolen vehicle, police did not learn the victim was dead, or discover the murder weapon and other incriminating evidence, until after defendant was placed under arrest on suspicion of a theft-related offense. His possession of the Yukon contextualized the evidence necessary to convict him of murder, but the fact the vehicle was stolen was immaterial. Defendant's lawyer acknowledged this at trial when he moved to exclude evidence the Yukon had been stolen, arguing "[t]he nature of the vehicle or the status of the vehicle is hardly relevant to the crimes charged in Counts 1 and 2 of the Information."[8]

The evidence necessary to prove first degree murder included the autopsy findings, the metal wire, the gloves, the DNA test results, witness testimony about the close relationship between defendant and the victim, and the fact the victim had made defendant the beneficiary of his life insurance policy. Proving the section 496d charge required establishing the stolen character of the Yukon and defendant's unauthorized possession of the vehicle. "[T]he practicalities of the two crimes demanded separate proofs." (*Flint*, *supra*, 51 Cal.App.3d at pp. 337–338.)

Defendant argues *Hurtado* is distinguishable because here "the vehicle itself was an instrumentality of the crime." He relies on the prosecutor's theory that the victim was

---

[8]The prosecutor opposed the motion, arguing the Yukon's stolen character was "relevant as to the entire investigation and whether or not the items inside the vehicle were his or not." The trial court ruled in favor of the prosecutor.

strangled from behind while seated in the GMC Yukon. The evidence supporting this theory was far from conclusive, especially at the time of defendant's prosecution in case BF170970A.

The victim's body was noted to be "fairly stiff" at the time of defendant's arrest, indicating some degree of rigor mortis. As set forth in a sworn declaration supporting the People's bail motion in case BF170970A, detectives believed, based on training and experience, that "it takes several hours or more, depending on weather conditions, for rigor mortis to set in." The declaration implies detectives therefore assumed the victim had likely died before defendant and Sidhu began their drive from Los Angles to Bakersfield.

According to the medical examiner, ligature strangulation requires at least two to three minutes of continuous pressure to result in death. There was no evidence of damage to the front interior of the Yukon, i.e., nothing to indicate the victim had struggled for his life inside the vehicle. The victim was discovered reclined in the seat, "partially covered with a camouflage jacket," "had a hat over his eyes," and "the lap portion [of the seat belt] was coming across his arm so his arm was actually under the lap portion." It was all suggestive of staging, and defendant's involvement in the staging could explain the presence of his DNA on the victim's face. But there was no clear indication of whether the victim had been strangled inside or outside of the vehicle.[9]

_____

[9]A sheriff's deputy later testified at the preliminary hearing to having "noted [the victim] had what appeared to be an abrasion under his right eye and then a second abrasion on his chin area." He added, "From seeing the injuries I'm going to say they didn't happen right then and there. They could have happened within a couple of minutes, 20 or 30 minutes I would guess prior to the stop. I couldn't tell you exactly what time frame." The quoted "guess" was the basis for the defense theory of the victim being strangled while defendant was driving the Yukon and only minutes prior to the traffic stop. However, the CHP officer who stopped the Yukon testified to observing discoloration around the victim's chin and "a little bit of dried blood," and a Cedars-Sinai employee testified the abrasion under the victim's eye was a preexisting injury.

Furthermore, as discussed, the defense theory ignored the fact the victim's arm was belted underneath the lap portion of the seat belt. Although the prosecutor's closing argument also arguably suggested a theory of him being killed while the car was moving (see fn. 5, *ante*),

20.

Defendant also contends "the prosecution had reason to believe [he] had acquired the vehicle for the purpose of committing the homicide." This argument is based on nothing more than his "acquisition of the Yukon relatively close in time to the killing," and we are thus unconvinced. The involvement of the stolen vehicle in the *murder*, as opposed to the planned disposal of the victim's dead body, was a matter of speculation. The prosecutor did theorize the victim was killed inside of the Yukon, but defendant's murder conviction did not require the jury's acceptance of that theory. (See *People v. Clark* (2011) 52 Cal.4th 856, 947 ["theories suggested by the prosecutor are not the sole theories the jury may consider in making its determination of guilt"]; *People v. Briscoe* (2001) 92 Cal.App.4th 568, 591 ["Any jury disagreement on subordinate issues is considered irrelevant. Specifically, … it does not matter if the jury disagrees about any facts proving the defendant guilty, even if based on differing theories"].)

Defendant again has a slightly better argument for the conspiracy charge. Although his receipt of a stolen vehicle was never said to be part of the conspiracy, one of the five overt acts pleaded in the information alleged the murder occurred "while [the victim] was inside the GMC Yukon." (Some capitalization omitted.) However, "[a]lthough the jury had to find at least one overt act, whether it was one or another of several possible acts only concerns the way in which the crime was committed, i.e., the theory of the case, not whether discrete crimes were committed. Thus, if the jurors disagreed as to what overt act was committed, and agreed only that *an* overt act was committed, they would still have unanimously found defendant guilty of a particular conspiracy." (*People v. Russo* (2001) 25 Cal.4th 1124, 1135.)

the prosecutor's opening statement suggested the murder happened *before* defendant "drove to Kern County from Los Angeles," and that he had "held [the victim] down by the floor" while Sidhu strangled him. The opening statement was omitted from the reporter's transcript, but it is included in a related appeal, *People v. Sidhu*, F083564, and we hereby take judicial notice of it. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); see, e.g., *People v. Bilbrey* (2018) 25 Cal.App.5th 764, 769, fn. 7 [taking judicial notice of the record in a related appeal on the court's own motion].)

21.

A separately alleged overt act was, "The defendants met on January 15, 2018–January 16, 2018, in Los Angeles County, California." (Some capitalization omitted.) Defendant's trial attorney conceded the truth of this allegation during closing argument, and Sidhu admitted it on the witness stand and in prior interviews. Therefore, neither defendant's receipt of the stolen vehicle nor his continued possession of it were essential to proving he conspired to kill the victim.

"[W]hat is relevant for *Kellett* purposes are 'the facts of defendant's conduct underlying the charged offenses.'" (*People v. Linville*, *supra*, 27 Cal.App.5th at p. 932, italics omitted.) In *Linville*, the appellant complained of being prosecuted for murder after having previously pled guilty to a closely related accessory charge. "The main overlap between the two prosecutions was, of course, the two killings[;] if there had been no murders, [she] could not have been prosecuted as an accessory." (*Ibid*.) However, "[t]he fact that both prosecutions involved the same killings [did] not by itself warrant a conclusion that the same course of conduct played a significant part in both." (*Ibid*.) The overlap in evidence concerning the GMC Yukon is an analogous circumstance.

In addition, the totality of the facts must be "'examined in light of the legislative goals of section[] 654 ….'" (*Short v. Superior Court*, *supra*, 42 Cal.App.5th at p. 912.) "One factor we may weigh, while not dispositive, is that [defendant] entered a quick guilty plea to the much less serious … charge, without a trial or even a preliminary hearing. In that circumstance, 'the public's interest in avoiding the waste of resources through relitigation was minimal,' whereas 'the public's weighty interest in prosecuting and punishing [him] for the serious crime[]' of murder was great." (*People v. Linville*, *supra*, 27 Cal.App.5th at p. 934.) "Another consideration is the relative seriousness of the charges." (*Id*. at p. 935.) "Given the gravity" of the first degree murder and conspiracy charges in comparison to the section 496d violation, "the risk of waste and harassment from a second prosecution following [his] guilty plea clearly was 'outweighed by the risk that a defendant guilty of a felony may escape proper

22.

punishment.'" (*Ibid.*; cf. *People v. Ochoa*, *supra*, 248 Cal.App.4th at p. 28 ["'When both offenses are serious crimes, the potential for harassment and waste is sufficiently strong that section 654 imposes on prosecutors an administrative duty to insure that the charges are joined'"].) These policy considerations further support the rejection of defendant's claim.

## DISPOSITION

The judgment is affirmed.


PEÑA, Acting P. J.

WE CONCUR:


SMITH, J.


DE SANTOS, J.